**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bobby D. PULLEY,**
**Defendant–Appellant.**

No. 90–5211.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 4, 1990.

Decided Jan. 10, 1991.

Rehearing and Rehearing En Banc
Denied March 25, 1991.

Joseph M. Whittle, U.S. Atty., Randy W. Ream, Asst. U.S. Atty. (argued), Terry Cushing, Asst. U.S. Atty., Office of the U.S. Atty., Louisville, Ky., for plaintiff-appellee.

John F. Carroll, Jr. (argued), John L. Smith, Patrick H. Molloy, Bradley H. Pruitt, Alagia, Day, Marshall, Mintmire & Chauvin, Louisville, Ky., for defendant-appellant.

Before NELSON and NORRIS, Circuit Judges, and HIGGINS, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

This is an appeal from a criminal conviction and sentence in a drug case. Perhaps the most significant of the several issues presented involves Rule 615, Fed.R.Evid., which governs the exclusion of witnesses from the courtroom so they cannot hear the testimony of other witnesses.

Subject to three exceptions, Rule 615 requires the trial court to order a separation of witnesses upon request. Here, notwithstanding such a request, the court allowed two government agents, both of whom were on the witness list, to remain in the courtroom throughout the trial. The court relied on the rule's second exception, which allows "an" officer or employee of a governmental or corporate party to remain as the party's designated representative.

The rule, as we read it, allows the designation of only one agent. But although a technical violation of the rule occurred, we conclude, under the circumstances of this case, that the error was harmless. Accordingly, and because we find no other prejudicial error in the record, we shall affirm the judgment.

I

During the latter part of 1988, as the evidence showed, a government informant in Bowling Green, Kentucky, made a series of cocaine purchases. In the course of several of these transactions one of the sellers repaired to a used car lot where defendant Bobby Douglas Pulley maintained an office. The government suspected that the sellers were getting their drugs from Mr. Pulley.

On December 9, 1988, members of a joint federal-state drug task force gave the informant $1,600 in marked bills and told him to make another purchase. The informant contacted his usual source, whereupon the latter's associate (one Johnny Humphreys) went to the used car lot and saw defendant Pulley in his office. When the meeting broke up, Messrs. Pulley and Humphreys were both arrested.

Mr. Humphreys was found to have an ounce of cocaine in his possession, and defendant Pulley had more than $3,000 in his pants pocket. Of this sum, $1,500 consist-

---

[*] The Honorable Thomas A. Higgins, United States District Judge for the Middle District of Tennessee, sitting by designation.

ed of marked bills with which the informant had been supplied that morning.

With help from other officers, a federal agent named Price searched defendant Pulley's office. No cocaine was found there. (The officers did, however, find a loaded revolver and two boxes of plastic "baggies" similar to those in which cocaine previously bought by the informant had been packaged.) Steve Trosper, a Kentucky State Police Detective, helped search the downstairs of a residence adjoining the used car lot. That search disclosed more cash (the combined total reached almost $18,000) and more baggies, but no cocaine.

A third officer, United States Customs Agent Donald Obermiller, eventually searched an upper floor of the residence. Although a dog trained to detect drugs had previously been led through the upstairs without result, Agent Obermiller, while going through one of the upstairs bedrooms, found a supply of plastic bags containing 132 ounces of cocaine.

Pulley, Humphreys and Humphreys' associate were indicted on various cocaine and firearms charges. A mistrial was declared during the first trial, after which Pulley and Humphreys, but not the third defendant, were tried again on a superseding indictment.

As he had done at the first trial, defense counsel moved at the outset for a separation of witnesses. The district court ordered the separation, but granted a request by the prosecution that Agent Price and Detective Trosper both be permitted to remain at the trial table even though both were scheduled to be witnesses. The prosecution made no attempt to show that the concurrent presence of both men was essential to the presentation of its case.

Agent Price was the first witness called by the prosecution, and Detective Trosper was the second. (The nature of their testimony, and of certain other trial evidence, will be discussed hereafter.) The jury acquitted Defendant Pulley on some charges, but found him guilty on two counts of aiding and abetting the possession of cocaine with intent to distribute it, one count

of possession with intent to distribute, and one count of conspiracy.

The United States Sentencing Guidelines called for a sentence of imprisonment in the range of 63–78 months. Finding an upward departure appropriate, the district court imposed a ten-year sentence (120 months), along with a $100,000 fine. This appeal followed.

II

Rule 615, Fed.R.Evid., provides as follows:

> "Exclusion of Witnesses
>
> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause."

The rule says that the court "shall" order a separation of witnesses upon request, and the notes of the Advisory Committee confirm that this means what it says; a requesting party is entitled to an order of separation "of right."

■ It is undisputed that under subpart (2) of the second sentence of Rule 615, at least one investigating agent may be designated to remain in the courtroom as the government's representative notwithstanding that the agent will be a prosecution witness. See *United States v. Parodi*, 703 F.2d 768, 773–74 (4th Cir.1983), and the cases there cited. The parties disagree as to whether the rule entitles the government to designate more than one agent-witness to represent it. The issue has not heretofore been decided by our court.

The district judge concluded that subpart (2) gives a trial court discretion to let the government be represented by two agent-witnesses. *United States v. Alvarado*, 647

F.2d 537 (5th Cir.1981), which was cited by the district judge, appears to support this view. *United States v. Farnham*, 791 F.2d 331 (4th Cir.1986), on the other hand, rejects it. So does *United States v. Kosko*, 870 F.2d 162 (4th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3197, 105 L.Ed.2d 704 (1989), which reaffirms *Farnham*.

We agree with the conclusion announced by the United States Court of Appeals for the Fourth Circuit in *Farnham* and *Kosko*. "Relying on the mandatory language of Rule 615 and the singular phrasing of the exception embodied in 615(2)," the *Farnham* court said, "we hold that the district court erred in refusing to sequester [the second agent], if not during the entire trial, at least during the testimony of his colleague." *Farnham*, 791 F.2d at 335.

The Fourth Circuit's reading of the rule is supported by the notes of the Advisory Committee, which contain this sentence: "As the equivalent of the right of *a* natural-person party to be present, a party which is not a natural person is entitled to have *a* representative present." (Emphasis supplied.) "Most of the cases," the note continues, "have involved allowing *a* police officer who has been in charge of an investigation to remain in court despite the fact that he will be a witness." (Emphasis supplied.)

"A" representative, like "a" natural person, "a" police officer, and "an" officer or employee, is singular. Our court has been known to treat the plural as the functional equivalent of the singular, see *Minority Employees of the Tennessee Dept. of Employment Sec., Inc. v. State of Tennessee Dept. of Employment Sec.*, 901 F.2d 1327, 1342 (6th Cir.) (en banc) (Nelson, J., dissenting), *cert. denied*, —— U.S. ——, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990), but in the instant case we can discern no reason to convert the singular into the plural.

Where the government wants to have two agent-witnesses in attendance throughout the trial, it is always free to designate one agent as its representative under subpart (2) and try to show under subpart (3) that the presence of the second agent is "essential" to the presentation of its case.

No such attempt was made here, and we doubt that the government would have been able to demonstrate that it was essential to have both agents in court together.

But we are not at the end of our inquiry. There is no strict requirement that the defendant prove prejudice in a situation such as this, but we nevertheless remain bound by the harmless error rule. *Farnham*, 791 F.2d at 335. We think the error committed by the district court in this case was harmless.

Agent Price, it will be remembered, was the very first witness to take the stand. He could not possibly have tailored his testimony to conform to the testimony of earlier witnesses, see *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976), because there were no earlier witnesses. Detective Trosper, who testified second, might theoretically have tailored his testimony to fit Price's, but that possibility would have existed anyway if the prosecution had simply designated Trosper as its sole representative. Had it done so, Agent Price would still have testified first, Detective Trosper would still have heard every word that Price said, and Price would doubtless have been permitted to remain in the courtroom following the completion of his own testimony unless there had been some reason to suppose he might be recalled. We should be reluctant to put the taxpayers to the expense of another trial merely because the prosecution happened to designate a superfluous "representative."

The testimony of Agent Price and Detective Trosper did not overlap significantly, moreover, "and therefore their mutual presence during trial could not have undermined the integrity of the fact-finding process." *Kosko*, 870 F.2d at 164. (Both men did testify to the discovery of the marked bills in defendant Pulley's pocket, but Mr. Pulley never denied that he had the bills; his story was that he received them in payment of a legitimate debt. Price and Trosper both testified as well about the search of Pulley's office and the consent given by Mr. Pulley and his mother to a search of the house, but here again there

was absolutely no dispute about the facts.) Neither witness dwelt at length on matters on which the other testified. Price talked primarily about the events that led up to the arrest and about what was found in the search of the office; the search of the residence, Price explained, was conducted primarily by Detective Trosper, Agent Obermiller, and an agent from the Internal Revenue Service. Detective Trosper, for his part, testified about the general methodology of the search and the custody and testing of the drugs after their discovery in the upstairs bedroom by Agent Obermiller. The testimony of Price and Trosper did not concern completely different facts, but the overlap was inconsequential. The risk of any significant harm was virtually non-existent.

## III

We turn next to an alleged hearsay problem in the testimony of Customs Agent Obermiller, the man who found the drugs in the upstairs bedroom.

Because it took some three hours to discover the drugs, and because the discovery occurred in a place where a trained "drug dog" had not detected anything, the prosecution thought it important for the jury to understand why the search was continued as long as it was. Such an explanation could reasonably be considered a significant step in allaying any concern that the police might have planted the drugs themselves, as the defense suggested they did.

After Agent Obermiller had described the search of the downstairs and explained that no unauthorized personnel could have gone upstairs while the search was in progress, he testified that there were two incidents which made him suspect that not everything had been found. The first such incident—the only one that concerns us here—involved a disclosure made in Officer Obermiller's hearing by a little boy of the household.

After an objection on hearsay grounds, the prosecutor explained at a bench conference that the testimony about the boy's disclosure was being offered not as proof that the matter asserted was true, but to show one of the reasons the agent suspected that something more remained to be found in the house. The objection was overruled, and the agent then testified to having heard the boy say that there had been a phone call for defendant Pulley while the family was eating lunch that day; that after receiving the call, defendant Pulley had gone first to the back area of the house, where the boy could not see him, and then to the office of the car lot; and that defendant Pulley had then returned to the table and resumed his lunch.

The trial judge was not asked to caution the jury that this testimony should not be considered as evidence that the events which Agent Obermiller heard described by the boy had actually occurred. The court did not choose to give such a cautionary instruction on its own motion.

Prior to closing arguments, defense counsel moved *in limine* that the prosecutor not be allowed to make substantive use of Agent Obermiller's testimony about the boy's statement. The prosecutor replied that he had "no intention of using it substantively." When asked if he planned to mention it at all, the prosecutor said that he did; he was "[g]oing to mention it [as one of] the reasons Mr. Obermiller decided he needed to search the upstairs." Defense counsel argued that any reference to the testimony would serve a substantive purpose as well, but the court denied the motion. Again, there was no request for a limiting instruction to the jury.

In the course of his final argument, the prosecutor argued at some length that Agent Obermiller—whose regular assignment was in Florida, where he worked on international drug cases—had no reason to try to frame a used car dealer in Bowling Green, Kentucky. There had been good reasons for Agent Obermiller not to abandon his search, the prosecutor argued, one of which was this: "he also overheard a 9 year old boy, the son of J.C. Pulley, say just before lunch [that] Bobby [Pulley] had gotten a phone call and went to the back of the house and came back with a package and took it over to the lot."

This sentence—the only one in the prosecutor's argument that mentioned the boy's statement—contained at least one factual inaccuracy. Agent Obermiller did not, in his trial testimony, say that the boy mentioned a package. There was no objection to this misstatement, however, and although defense counsel alluded to the boy's disclosure in his own closing argument, he did not point out the prosecutor's error. (Defense counsel also noted that the boy was in the courtroom and could have been called as a witness by the defense. "I didn't call him as a witness, I won't do that. That's not necessary," defense counsel told the jury.)

Whether Agent Obermiller's testimony about the boy's statement constituted hearsay is a question of law. A trial court's conclusions on such questions are reviewed here de novo. United States v. Levy, 904 F.2d 1026, 1029 (6th Cir.1990).

Rule 801(c), Fed.R.Evid., provides the following definition: " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." If Agent Obermiller's testimony about the boy's statement was offered to prove the truth of the boy's account of the telephone call and defendant Pulley's subsequent movements, the testimony was hearsay. If it was offered to prove that Agent Obermiller had good reason to continue his search of the house, it was not hearsay. And if it was offered for both purposes, it was hearsay in one aspect and not in the other.

The question of the prosecutor's purpose is essentially a question of fact, and we have no basis for rejecting the factual finding implicit in the trial court's decision to allow the testimony here. But there is another question that must be addressed. See United States v. Martin, 897 F.2d 1368 (6th Cir.1990), where, although we concluded that "scene-setting" testimony not unlike that at issue in this case did not constitute hearsay, its admissibility had to be analyzed under Rule 403, Fed.R.Evid.:

"When inculpatory out of court assertions name the criminal defendant in connection with 'setting the scene' for an investigation, the question of unfair prejudice under Rule 403 of the Federal Rules of Evidence almost always arises. That Rule states in relevant part that 'evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice....' Rule 403, Fed.R.Evid.

The relevance and probative value of 'investigative background' is often low, but the potential for abuse is high. In this case, there was no issue of improper investigative methods. The naming of appellant substantially increased the risk the jury would consider the unnamed other person's information in determining the guilt or innocence of appellant on the trafficking counts. The danger was compounded when the prosecutor repeated the appellant's name in briefly summarizing [the] testimony." Id. at 1372 (citations omitted).

Although there was no issue of improper investigative methods in Martin, there clearly was such an issue in the case at bar. The testimony about the boy's statement therefore had a higher probative value than it otherwise would have had. Mindful of the fact that the boy could easily have been called to testify for the defense, we conclude that the value of the testimony about what Agent Obermiller heard the boy say was not substantially outweighed by any danger of unfair prejudice or confusion.

The prosecutor's misstatement during final argument was unfortunate, but it was not incumbent on the trial judge to volunteer a comment on the slip. After reading the argument in its entirety, we are satisfied that the fleeting reference to what Agent Obermiller was supposed to have heard the boy say did not deprive defendant Pulley of a fair trial and would not justify a reversal of the conviction.

## IV

The only remaining issue that we shall discuss in detail concerns the decision of the district court to depart from the guidelines by imposing a sentence of im-

prisonment 42 months longer than the maximum sentence within the range prescribed by the guidelines.

In determining the guideline range the court increased the base offense level by two levels, as authorized by U.S.S.G. § 3C1.1, on the basis of a finding that the defendant willfully obstructed justice by lying during his testimony at trial. See *United States v. Acosta–Cazares*, 878 F.2d 945, 953 (6th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989), which sanctions an increase under such a circumstance. In addition, the court granted a government request for an upward departure pursuant to U.S.S.G. § 5K2.7. "If the defendant's conduct resulted in a significant disruption of a governmental function," that section of the guidelines states, "the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected."

The government argued that defendant Pulley had caused a significant "disruption" of a governmental function by persuading his co-defendant, Mr. Humphreys, to walk away from a confession that he had been obtaining drugs from Pulley for months, and by persuading members of the Pulley family to perjure themselves. A nephew of defendant Pulley gave testimony suggesting that government agents had planted drugs found in Humphreys' possession, and the government asserted that this testimony was the *quid pro quo* for Humphreys' agreement not to take the stand and subject himself to cross-examination about the earlier confession.

The district judge accepted the government's argument, stating that after sitting through the trial for two weeks he "would have to be from another planet not to think there was some collusion involved...." Declaring that Mr. Pulley had woven "a web of deceit," the court stated that Pulley drew both Humphreys and members of the Pulley family into his web. In some respects, the court found, testimony given by members of the family was not credible.

Under 18 U.S.C. § 3553(b), a sentencing court must impose a sentence within the guideline range unless it finds "an aggravating or mitigating circumstance" that ought to result in a different sentence, and further finds this circumstance to be "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." Citing *United States v. Uca*, 867 F.2d 783 (3rd Cir.1989), which involved neither perjury nor collusion resulting in disruption of a governmental function, Pulley argues that behavior such as his was adequately taken into consideration by the sentencing commission when it formulated U.S.S.G. § 3C1.1. The district court having increased the offense level under that section on the basis of Mr. Pulley's allegedly false testimony, the argument continues, an upward departure from a range that already reflects that increase is not permissible.

The argument is faulty, we believe. In the first place, it ignores the statement in U.S.S.G. § 5K2.0 that "the court may depart from the guidelines, even though the reason for departure is listed elsewhere in the guidelines (*e.g.*, as an adjustment or specific offense characteristic), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." In the second place, the argument ignores the fact that the district court did not grant the departure on the basis of Pulley's own perjury. The court granted the departure, rather, because it was satisfied that Pulley had induced others to give false testimony and had colluded with Humphreys to prevent the use of the confession in which Humphreys had named Pulley as his supplier. These circumstances were in no way involved in the calculation of the guideline range.

We must accept the district court's factual findings unless they are clearly erroneous, and we must give due deference to the district court's application of the guidelines to the facts. *United States v. Christoph*, 904 F.2d 1036, 1039 (6th Cir.1990). We do not believe that the factual findings in this case are clearly erroneous—and given the facts as found by the district court, we do

not believe that the departure was unlawful or unreasonable.

Mr. Pulley's other assignments of error relate to the sufficiency of the evidence with respect to one count of the indictment and to testimony about the defendant's failure to give a statement following his arrest. Our examination of the record has not persuaded us that Mr. Pulley is entitled to a reversal on either ground.

AFFIRMED.